No. 34,107

NORMAN BAKER, *Appellee*, v. E. HALDEMAN-JULIUS, *Appellant*.

(88 P. 2d 1065)

Opinion filed April 8, 1939.

*George F. Beezley,* of Girard, for the appellant.

*Thomas D. Winter,* of Girard, and *H. L. Fisher,* of Laredo, Tex., for the appellee.

The opinion of the court was delivered by

THIELE, J.: This was an action for libel. Defendant demurred to the amended petition and appeals from an adverse ruling.

The amended petition alleged that plaintiff was a resident of the state of Iowa and was not licensed to practice medicine. Several years prior to publication of the article complained of, plaintiff had obtained, discovered and developed certain remedies for the treatment of cancer and other ailments, and about the year 1929 had established a hospital at Muscatine, Iowa, which was operated by duly licensed physicians and surgeons who utilized the Baker remedies with great success; that approximately 12,000 persons had been treated at the hospital and fully seventy-five percent of them had been cured or greatly benefited, and by reason thereof the Baker remedies had become widely and favorably known; that plaintiff, for the purpose of increasing the sale and use of his remedies, had advertised extensively by circulars, booklets and radio addresses, and had become widely known throughout the United States. It was further alleged that defendant was engaged as a publisher at Girard and distributed books, papers, circulars, etc., throughout the United States and was widely known as a publisher, and that for the purpose of defaming plaintiff and of injuring and tearing down his reputation, and of damaging and injuring plaintiff's standing and influence and the faith and confidence the public had in him and for the purpose of exposing plaintiff to public hatred, contempt and ridicule and to impeach his integrity, published in

*The American Freeman* an article under the heading "Questions and Answers" certain libelous, false and defamatory matter of and concerning the plaintiff. The article will be referred to hereafter. That the article falsely and maliciously charged, and was meant to charge and be understood by ordinary readers as charging that plaintiff was a dishonest, conscienceless, persistent liar, cheat and fraud, who made false statements and representations for the purpose of obtaining money from persons incurably ill, and particularly from the ignorant, referred to as yokels, and as intending to charge that plaintiff's remedies are worthless and do not benefit the persons to whom they may be administered, etc. It was further alleged that the aforesaid publication was false, defamatory and libelous and was made deliberately, maliciously and recklessly without any effort to ascertain the truth from plaintiff or to make any investigation of the hospital and ignoring its success and for the deliberate purpose of injuring plaintiff's reputation, his standing for honesty and integrity, of causing him personal and financial loss and of bringing upon him the distrust, dislike, ridicule, contempt and hatred of people who might be readers of defendant's publication, and that by reason of the publication plaintiff had suffered severe loss in his good name, in his reputation and standing for honesty and integrity, and in his business standing, and had also suffered severe financial loss. He prayed for actual and exemplary damages.

The article complained of is too long to be quoted in full. We quote and summarize as follows:

"Does the Baker cancer treatment actually cure a substantial percentage of its cases, as it claims it does—or are such claims a pack of lies?

"Norman Baker, of Muscatine, Iowa, is one of the most dangerous quacks in the world—a mercenary charlatan who is a menace to his gullible victims. The man knows absolutely nothing about cancer, but he is a brilliant publicity-monger, which enables him to attract thousands of ailing suckers to his 'hospital,' where he advertises, lying of course, that cancer is curable. He rests his publicity on so-called testimonials, which means merely this: uninformed, untrained laymen diagnose their ailments and sign statements that Baker has 'cured' them. Such 'evidence' means exactly nothing. Instead, let Baker receive a group of cancer patients who have been declared to be in even moderately advanced stages—accredited as cancer sufferers by competent experts of real standing in the scientific world—and let him cure just one such case and I'll take back my charges of quackery and become his most enthusiastic supporter. The fact is, of course, that Baker can't cure cancer, because the terrible malady is still uncurable, science being helpless. . . ."

This portion is followed by statements that science does not know what cancer is, that in early stages some cancer patients may be saved, but others are doomed, and

"Don't, by any means, listen to a Baker who is out to get your money and grow rich through your suffering. He has no standing in science, he is known to be nothing more than a yokel-baiter, and trusting him will mean nothing but wasted time, money and hope."

The author of the article states he made inquiry of the editor of the *Journal of the American Medical Association* and received a reply which is quoted. It is to the effect that Baker is not a doctor of medicine; that he was exposed in the *Journal* of April 12, 1930, and sued for half a million dollars in damages, but when the case was tried the jury returned a verdict in the association's favor; thereafter Baker went to Mexico and established a radio station, but continued to run his institution at Muscatine. In March, 1935, it was reported that Baker's application for restoration of his federal license to run a broadcasting station in Muscatine had been denied. In October, 1935, the newspapers reported that Baker had been found in contempt of court and punished for practicing medicine without a license in Iowa. The author of the article then states that Arthur J. Cramp, "who is one of our greatest authorities on medical charlatans and quackeries," had made a study of the enterprises of Norman Baker, and that use of his writings had been made for the facts presented, and it was learned that Baker had applied his "shrewd salesmanship" to cigars, radios, storage batteries, alarm clocks and other articles, and suddenly blossomed out as a cancer expert and urged his treatments positively cured cancer; that he obtained a "formula" for "internal cancer" from one source and a "formula" for "external cancer" from another, and had confessed, when questioned on the witness stand, he made as much as $75,000 in a single month, and even after his "cures" had been exposed, Baker continued to take in large sums. Omitting much matter dealing with Baker's activities, it is further recited that Baker commenced his cancer promotion with an invitation broadcast over radio, that he wanted five persons suffering from cancer to take his treatment at his hospital (in Kansas City, Mo.), the expense to them being only their own transportation. Attention is then given to some of Baker's advertising in which it is stated that Baker and his fellow investigators selected the cases themselves for observation after they had determined they were authentic cases of cancer, that

they had watched these cases and saw the cancers grow smaller and pass away. After stating in detail that Baker was advertising the cases had convinced him "cancer" had been conquered, it was stated the five test patients were dead. Details of the five cases are set out. One, typical of all, is as follows:

"Test Case No. 3—This was described in Baker's magazine as that of a patient who had had an exploratory operation by reputable surgeons which disclosed the fact that the case was inoperable. He took the 'treatment' at Kansas City as one of the 'test' cases, and then continued taking them at Baker's 'institute.' As late as June, 1930, Baker was still sending out reports implying that the man was practically cured, although, as a matter of fact, he had died six months previously—in December, 1929!"

The concluding paragraph of the publication is as follows:

"Space doesn't permit me to go into the Cramp exposure of Baker to the extent that the case warrants. The appalling record is crowded with heart-breaking reports of cancer victims putting themselves in Baker's hands at Muscatine, separated from their money—and sent home to die. It's humiliating to admit that such scandalous enterprises are permitted to operate in this country."

Where a general demurrer is lodged against a petition in an action for libel, the allegations of fact are taken as true, the same as in any other action (*Stinson v. Wooster*, 83 Kan. 753, 112 Pac. 610), and we must discuss appellant's contentions in that view of the situation. Appellant first contends that the petition shows on its face the truth of the alleged false and libelous matter. The gist of this contention is that the article wrongfully called appellee a quack, a charlatan and a yokel-baiter, and that the allegations show that to be true. Our attention is directed to definitions of "quack" as being a boastful pretender to medical skill and a medical charlatan, and of "charlatan" as being one who makes unwarrantable pretensions, especially as a vendor of remedies. It is then urged that the petition alleges not only that plaintiff is not a doctor of medicine, but that appellee thinks he has a right to practice medicine, hence his conduct comes within the usual definitions of "quack" and "charlatan." In the course of his argument, appellant calls to our attention the decision in *State v. Baker*, 212 Ia. 571, 235 N. W. 313, dealing with illegal practice of medicine, presumably by appellee, and to our decision in *State, ex rel., v. Cooper*, 147 Kan. 710, 78 P. 2d 884, dealing with unlawful practice of medicine, and contends that the petition admits that the appellee, not licensed to practice medicine, is in fact treating cancer and is therefore a quack

and a charlatan. It is true the petition alleges appellee is not licensed to practice medicine in Iowa. But that is not the only allegation. Appellee further alleges that he obtained, discovered and developed certain remedies for treatment of cancer and established a hospital at Muscatine, Iowa, for treatment of human ailments, and that the hospital had been operated by duly licensed physicians and surgeons who utilized the Baker remedies with great success, and that at the hospital seventy-five percent of the patients treated had been cured or materially benefited. On the appeal as now presented, the truth of the above is admitted.

It can hardly be contended that a manufacturer and producer of a medical remedy need be duly licensed to practice medicine. That license is required only where he prescribes the remedy to one seeking medical advice from him. The appellee is entitled to have his petition construed according to his own theory, *i. e.*, that he has discovered, developed and perfected remedies for the treatment of cancer, has established a hospital operated by duly licensed physicians for the treatment of patients suffering from that disease, and has had a considerable success and that the offending article, in its statements of facts, is not true, and defendant in charging him with being not only a quack, charlatan and yokel-baiter, but also a liar and cheat, guilty of fraudulent pretenses about what has been accomplished by use of his remedies, and guilty of wrongfully obtaining money, has damaged him in his reputation, in public faith and confidence in him, has impeached his honesty and integrity, etc. We cannot ignore the allegation that the alleged defamatory article is false. Unless that allegation be ignored, it may not be said the petition discloses the truth of the article.

This case, in its present status, is not controlled by *State, ex rel., v. Cooper,* supra. There the proof on trial showed that the defendant, who was not licensed to practice medicine, was personally prescribing and administering his cancer remedy to patients for a fee. The petition now before us makes no allegation from which a similar conclusion must be drawn.

We cannot agree with appellant's contention the petition shows on its face the truth of the alleged libelous matter.

Appellant contends the publication was privileged or conditionally privileged and therefore not actionable. Although doubt has been expressed that any publication of defamatory matter is absolutely privileged, it may be said that absolute privilege is recognized as

applying to cases in which the public service or the administration of justice requires complete immunity as in legislative, executive and judicial proceedings, the occasion for the immunity being not so much for those so engaged as for the promotion of the public welfare. (36 C. J. [L. & S. § 204], p. 1239 *et seq.*) Without further discussion, it may not be said the publication here involved was absolutely privileged. On the proposition the publication was conditionally privileged, appellant directs attention to a number of our decisions. Many of them treat of articles dealing with judicial proceedings and the conduct of public officers and are to be distinquished for that reason. We shall not attempt to review our many cases in which the question of conditional privilege was either directly or indirectly involved.

In *Richardson v. Gunby,* 88 Kan. 47, 127 Pac. 533, where a defamatory letter was written in response to a request for information, contention was made that the defense of privilege was not pleaded. In discussing what is privilege, it was said:

"The privilege above referred to is not absolute, but of the class called qualified or conditional, comprised of cases where 'The circumstances are held to preclude any presumption of malice, but still leave the party responsible if both falsehood and malice are affirmatively shown! (Cooley on Torts, p. 211; *Kirkpatrick v. Eagle Lodge,* 26 Kan. 384.)

"'A conditionally privileged publication is a publication made on an occasion which furnishes a prima facie legal excuse for the making of it; and which is privileged, unless some additional fact is shown which so alters the character of the occasion as to prevent it furnishing a legal excuse. . . . The proper meaning of a privileged communication is, "that the occasion on which it was made rebuts the inference arising prima facie from a statement prejudicial to the character of the plaintiff, and puts it upon him to prove that there was malice in fact."' (Townshend on Slander and Libel, 4th ed., § 209.)" (p. 50.)

It would appear that the publisher of an article prima facie privileged would be held in damages to one defamed thereby if the latter could sustain the burden of showing falsity and express, as distinguished from implied, malice.

In *Carver v. Greason,* 101 Kan. 639, 168 Pac. 869, plaintiff sought to recover damages for libel in an article concerning his activities as county attorney. Defendant's demurrer to the petition was sustained. On appeal to this court the ruling of the trial court was reversed, it being stated in the opinion:

"The defendant contends that the article contained an account of a judicial proceeding, with comment upon it, and that even if false, the publication was

privileged. The narrative portions of the article and the comments extended considerably beyond what took place in court, and the petition, which must be taken as true for present purposes, charged the falsity of the entire article. Besides this, malice and a specific intent to injure the plaintiff were charged. The result is that the defense of privilege cannot be made out from the face of the petition." (p. 641.)

Even though it be assumed the petition disclosed the offending article was published under such circumstances that it might be said to be prima facie conditionally privileged, it clearly appears that the truth of the article in all its parts is denied, and it is specifically alleged that the publication was made "deliberately, willfully, maliciously and recklessly" and "for the deliberate purpose of injuring plaintiff's reputation, his standing for honesty and integrity," etc. Perhaps the adverbs did not help, but the other allegation is sufficient to charge express and willful intent to harm—an evil intent. The demurrer admits these allegations. In *Carver v. Grearson*, 104 Kan. 96, 177 Pac. 539, it was held:

"Whether the language used in a particular case on its face constitutes evidence of actual malice is a question of law to be determined by the court.

"An article in a newspaper alleging that a county attorney, before recommending the parole of a defendant who had pleaded guilty to a felony, had not made a vigilant investigation of his record or he would have discovered that he had previously been an inmate of a penitentiary, held not to show malice on its face, although the conduct of the officer in that regard was characterized in somewhat offensive language." (Syl. ¶¶ 3, 4.)

We think it may not be said the petition showed on its face the publication was so privileged that recovery of damages by the plaintiff was precluded.

Appellant makes a further argument the petition was demurrable because not only is malice or wrongful purpose not shown, but on the contrary the whole article complained of states opinions of eminent authorities and shows a good purpose to protect sufferers from a dread disease. The difficulty with this argument is that it is charged the whole article is false, and as stated above, there is specific allegation of malice and wrongful purpose.

It is also contended by appellant the article complained of expresses the generally accepted scientific view that cancer is incurable, and based upon such view, it is not libelous to say appellee cannot cure cancer. In support, we are referred to a quotation from *Stotler v. Rochelle*, 83 Kan. 86, 109 Pac. 788, which involved establishment of a cancer hospital in a residence district in Kansas City, wherein it

was said that perhaps the court may take notice of the prevailing view in the medical profession dealing, not with cure, but with communicability of cancer from one person to another. It is argued that if this court could take notice of the article in "The Lancet" there referred to, we may take notice of present generally accepted authority that cancer is incurable except in its early stages. We shall not pursue the question. The gravamen of the libel charged is not based on the statement cancer is incurable except in early stages.

Coupled with the above contentions is the further one that, taken as a whole, the article shows the author made an investigation through reputable sources and wrote from what he learned, that his attitude was one of public service, etc. We are not unmindful the article may be so read. We also are aware that at the argument of this cause, certain admissions concerning the plaintiff and his past history were made by his counsel, but we have before us for consideration a petition in which no such admissions are made. That petition charges the entire published article is false, and for the purposes of the demurrer, that must be accepted as the fact.

The judgment of the trial court is affirmed.